Oyez, oyez, oyez, all persons having business before the Honorable, the United States Court of Appeals for the District of Columbia Circuit, are admonished to draw near and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Case number 20, that's 1449A, American Municipal Power, Inc. et al. Petition v. Federal Energy Regulatory Commission. Ms. Murphy for the Stakeholder Petitioners, Mr. Gossett for the Consumption Program Petitioners, Ms. Keith for the Respondents, Mr. Longstress for the Respondent Intervenors. Good morning, Ms. Murphy. Whenever you're ready. Good morning, Your Honors, and may it please the Court. Erin Murphy on behalf of the Stakeholder Petitioners. When transmission owners joined the PJM Regional Transmission Organization, they agreed to delegate to PJM the responsibility for the enhancement and expansion of the regional transmission grid to which they were committing their facilities. Yet, as things currently stand, upwards of two-thirds of the projects for new transmission facilities to serve the region are not by PJM, but by transmission owners making unilateral determinations about how to address needs that arise when they choose to retire from that grid one of their facilities that has reached its end-of-life. In the series of first orders at issue here, FERC not only sanctioned that lopsided planning regime, but cemented in place a regime under which literally billions of dollars of these end-of-life projects will have their costs allocated locally without regard to whether they have regional benefits. The ultimate result is to establish consumers like many of the consumers that my clients here today represent with local costs for regionally beneficial projects in which the Regional Planning Authority, PJM, has had virtually no involvement. And if I could just have you step back a second just to kind of understand the regime and scheme. Are stakeholders and members interchangeable? So, generally the stakeholders that I'm hearing, there's stakeholders who are members, there may be some among our client group. I'm not 100% certain that there are some who aren't members, but we have members and stakeholders and generally people who kind of put forward the proposal on behalf of the PJM membership. And is there a document that expressly identifies more than just the stakeholders who are issued in this case? I don't know offhand kind of where in the stakeholders, what I can tell you is the member's proposal that was put forward here was supported by a supermajority of the membership. So, it may not be that all of that supermajority is a party to this proceeding. I just want to know how far reaching the implications of any of our decision-making go. Sure. I mean, I think that your decision-making would impact basically the entirety of kind of the PJM universe without regard to precisely who the parties are that are up here, you know, challenging things as members or as parties to the owner's agreement, because ultimately what we're talking about is how to interpret the documents that govern the PJM owner's relationship, the PJM operating agreement, and the PJM. And then one last question on that kind of setup. How would we use stakeholders versus transmission owners? So, the transmission owners are, you know, they're the parties that own the facilities that kind of make up the PJM grid, and they have entered into the owner's agreement with themselves and with PJM that delineates the differences between their rights and the rights that they have delegated to PJM. The stakeholders and the members are essentially kind of the customers of the PJM transition grid by and large, and some of them, you know, there are some entities, some of my clients are both owners who are parties to the owner's agreement, and they are customers within PJM who take transmission from the grid and are also members and stakeholders and parties to, are part of the membership that works on the operating agreement. And now that's it. I'll take a chance to give a little grace for you because I just needed to find that answer. Thank you. Ms. Duffy, isn't the stakeholders' position that all end-of-life projects should be part of the regional plan or some subset of them? I mean, because it seems that there is between both sides sort of like an either-or. It's either all of them are left to the discretion of the transmission owners or all of them are with PJM. So, it's not our position that all of these projects need to be regionally planned. We do think that they all fall within PJM's planning authority, such that basically under our proposal, the member's proposal that was the one that was rejected in the second set of first orders here, we would have essentially had PJM to stop in the first instance when a need arises because a facility has been retired. We want PJM to be involved in deciding, is that a need that gives rise to a project with regional benefits, in which case it should be regionally planned, or maybe it is a project that's local and can be locally planned. What we don't want is a world in which transmission owners can make that decision for themselves and decide to locally plan projects even when, as here, it's clear that they actually have projects with regional benefits. And is that because end-of-life projects are part of an enhancement or expansion? We think they are. I guess the way I would put it is, I think it's helpful to think about it less in terms of the project and more in terms of the need. What happens when you retire a facility that's currently serving the regional grid is you have a need for transmission on the grid. And we think the question of how you should deal with that need is a question that involves planning about the enhancement and expansion of the grid. Now, it may be that the ultimate determination about a proper project, in some instances, is something that's preventable and doesn't really have a huge impact in terms of enhancement or expansion. And PJM can say, that can be locally planned and you can do it. But the universe of things we're talking about, when you're saying, we're going to take something offline that's currently serving the regional grid, to us, that fits very comfortably within that planning responsibility to deal with enhancement and expansion of the grid. And do you think that's true with respect to the terms of the owner's agreement as it is written now or that the owner's agreement would require some kind of amendment to make that clear? I think it's unambiguous within the terms expansion and enhancement. And I think one of the principal problems with first reasoning here is, first of all, acknowledge that the way they have read those two terms deprive enhancement of any independence. Because FERC has defined an enhancement to mean only a capacity expansion. And if the only thing that counts as an enhancement is capacity expansion, then lots of things that, in common parlance, would be enhancements, things that increase reliability, increase efficiency, increase cost effectiveness, are enhancements that somehow have been read right out of the agreement. So you're not only depriving enhancement of what I would think of as just ordinary plain meaning. You're really depriving it of any meaning at all and reading this agreement as if the only thing that was delegated is planning authority with respect to capacity expansion. I don't think that's a natural or appropriate reading of the plan. I'm sorry, will you finish with that one? I have a procedural question. You argue that the, in your brief at least, you argue that the transmission owners surrendered their filing rights to PTN and you rely on the tariff section 9.2, right? Yes. I'm curious about it. You cite it, but you don't seem to make a big deal out of it. What is the term, what is the phrase, what is the phrase, what is the phrase terms and conditions of the PGM tariff mean? What does that mean in the tariff? So I think the dichotomy we see between 9.1, which reserves filing rights to the owners, and 9.2, which reserves to PGM, is that 9.1 is focused on things that are very specific to rates. And so I think the universe of what we would think of as planning decisions, which is what we're talking about in the first instance here, obviously these are planning decisions that impact FOTS allocation, but that planning determinations in the tariff about who is going to decide what should be billed are things that we would fit into that broader language in 9.2. And so if you're right about that, is the consequence simply that the transmission owners just need to submit their proposed tariff revisions to PGM and follow those procedures? Is that the only difference? And the procedure on that? Yeah. Suppose you're right about this. Suppose you're right that this filing right, they surrendered. What are the consequences of that? So as I understand it, PGM doesn't have an obligation or even authority, I don't think, to file a unilaterally, something that's put where we're just by the owners to change the tariff. So if we're right about that, the changes to the tariff have to come through PGM, through the PGM membership directing PGM as to what the filing should be, which is what happened with respect to our proposal. Yes, that's the way yours worked. Right. But does PGM have any choice about that? So I don't think, you know, I think as we read kind of the filing obligations of PGM, it doesn't have the ability to file something that's just put forward by the owners that isn't within the owner's 9.1 rights. No, I'm talking about the, oh, all right, well, tell me what will happen. Suppose we agree with you that this has to go to, this has to go back to that reason. What will happen? I think if you agree with us, then the, what would have to be come up through PGM is something like the member's proposal, that because it would have to come through for PGM to file it, it would have to be something that the owners got the members to agree to direct PGM to file. So, you know, you end up with. So you would have control over it? We would have control over what would be filed. And FERC would have the same ultimate question of looking at, you know, probably the member's proposal and determining whether it thought the member's proposal was consistent with the owners, the rights of the owners in the owner's agreement and the broader documents here. So, you know, I mean, ultimately, I don't want to suggest, we actually care quite a bit about this question of who has the rights to file because it has broader implications, not just in this case, but for several cases in which we've been having a debate with FERC and the owners for years about what the scope of their filing rights are. But in this case, you know, you probably still end up reaching the question of whether there is who has the planning authority because the member's proposal was put forward properly to FERC, pursuant to the member's right to have PGM make filings on their behalf. And FERC did address that question in the member's proposal, orders separate from its discussion in the local proposal. Is the filing authority question also linked to the substantive question about whether the transmission owners have, you know, authority for end-of-life planning? Because if they do, if you assume that they do have authority over end-of-life projects, then doesn't that pertain to their transmission revenue requirements, right, which is a category over which they retain filing rights? So if they have the authority to plan those projects, then they need the revenue to pay for those projects and so would have filing rights. So I'm wondering if the two questions are, in fact, interrelated. So I think they're related. I don't think at the end of the day they stand and fall together, but I do think they're related in the sense that, you know, we would say it's not kind of terribly surprising that 9.1 is focused on rates and not planning because that is consistent with kind of the broader dichotomy of what we think is the right understanding of the owner's agreement and the delegated rights under Section 4.1.4, that, you know, rates and rate determinations are something that owners did reserve the rights to make their filings to FERC about, but planning determinations, that's exactly what they gave up was the right to do planning for the broader enhancement and expansion of the regional transmission grid because that was sort of the point. We're joining the grid, we're putting our facilities in that grid, and we're entrusting a regional authority to make determinations about what the needs are and how best to address them for the broader region. So, you know, I do think there, I think there's a reason that, you know, the parties kind of both see them as aligning with their ultimate substantive positions about rights, but at the end of the day, I don't think that there's a reason that, you know, you kind of have to read them such that if you reach one conclusion about filing, that necessarily follows that you would reach the same conclusion. With respect to the 8.5 section that's dealing with the voting rights, it actually refers to an administrative committee versus TJM. So how does that play into... Sure. We think that's actually like a critical distinction here, which is that the owners chose to act through the administrative committee. And as we said in our reply, if they hadn't chosen to do that, they wouldn't have been bound by the procedural requirements that apply to action through the administrative committee. It's not obvious that they had to act through the committee. They could have put out their proposal themselves, but having chosen to act through the committee, the committee can only act if it takes a vote. And it did not do that here. It took a vote ultimately on the proposal, but not on that initial step of submitting the proposal to everybody for them, basically to the membership for input. And I do, you know, I just want to be clear that there's, you know, there's a reason we care about this. It actually is sort of what helped them gain the timing of it and jump us in line because we were right to vote, have the membership that's ready to vote on proposals, to put out notice, we're going to vote on a proposal in a couple of weeks. And the very next day is when the owners jumped us in line and filed their proposal with FERC, and then FERC was unwilling to consolidate our two proposals and consider them together. So the whole kind of trajectory of how all of this got teed up at FERC and the lens through which FERC was looking at it ended up being controlled by the fact that they filed this, that they put in this filing before we could complete the membership vote on our filing. And they wouldn't have been able to do that if they complied with the obligation to take a vote on the initial step of putting that proposal out for, for membership input, because there's procedural dynamics that apply to putting something out for a vote for the administrative committee input. So you take a different position in terms of, there's not a, you think that there should be essentially a vote to put the proposal out before. That's right. If you want to ask the administrative committee, you know, our view is you need to take the vote for both the preliminary step and the ultimate step. Not a consultation. To take the vote to do the consultation. And then ultimately you have the vote at the end. So, so we do think that there are a couple of procedural defects here, but you know, I also want to be very clear that we think there's fundamental substantive defects with FERC's reasoning. Ms. Murphy, can you say a little bit about if we were to vacate FERC's orders here, what, what would you have us direct them to do on remit? Consider the two proposals together. I think it would be, you know, I suppose there's a couple of different ways you could vacate this. You could vacate the first set of orders on the ground that there were procedural defects. The procedural defects don't kind of naturally carry over to the second set of orders. Now, you know, I think this court could say, look, you know, that kind of impacted the whole thing. So just please start over. But I also think given that the orders on the members' proposals independently addressed the substantive question of who has the power here, that it would be absolutely open to this court. And you know, we certainly urge the court to take a step of addressing in the context of the members' proposal, the fundamental problems with the reasoning that FERC employed so that we don't go back to square one and just kind of show up here again a year from now in exactly the same, you know, in just a little bit different. And we do think that both, you know, whether you're looking at this through the lens of the local proposal or through the lens of the members' proposal, that this language in the owners' agreement about enhancement and expansion unambiguously gives this planning power. Do you think it was arbitrary and capricious for FERC to consider the two  You know, I mean, we haven't independently argued, you know, kind of independently challenged the failure to consolidate. I don't quite understand why you wouldn't consolidate. I mean, clearly all of this is arising in the same context. You have here, you know, the same parties aligned in the same substantive positions in the opposite way. Some of the arguments of the stakeholders go to whether, you know, whether FERC had to consider whether the proposals were just and reasonable. Right. And it seems like it would be very hard to make that determination looking at the proposals separately because they're two competing proposals. And so therefore they would have to say, one is just and reasonable or neither are just and reasonable or, you know, something about both of them. I think that's exactly right. And it goes to what, you know, to me, one of the most kind of varying problems with the reasoning is the failure to account for the classification principles, which are important to both of these proposals. I mean, as we repeatedly explained below, the local proposal, sure, you know, FERC's right that it doesn't change the formulas for how consolidation will work. But what it does is the same thing that was going on in the Old Dominion. It takes a category of projects and says, this category is going to be subject to local cost allocation. We put in a bunch of evidence in the administrative record that this category, just like in Old Dominion, includes significant numbers of projects that have regional benefits. I mean, we put in evidence that we were talking about in one year alone, like $750 million of these costs, half of that was misallocated if you just apply ordinary consolidation principles. Now, if FERC were really looking at, you know, that proposal side by side with our proposal, under our proposal where we're saying we think there should be a special determination by PJM to decide, look, some of these projects, local, fine. They can be locally cost allocated. Some of these projects are regional. And as to those, we need to either have regional cost allocation, or at the very least acknowledge that we're not having it, and explain why that's consistent with Old Dominion, with Energy Arkansas. You know, I think the answer for Dave is simply say, oh, this filing isn't about the formula itself. So we can ignore the fact that this filing is deciding what cost allocation should apply. I mean, to me, that is kind of classic arbitrary, even without having just put out an opinion a couple of years ago, saying in the specific context of end-of-life projects, that FERC has an obligation to deal with cost causation principles that FERC should do presumptively when we have regional projects doing regional cost allocation. And that if you're not going to do that,  Now, I will say, you know, I think there's a reason that these projects ended up going, you know, why the local proposal designates them categorically for local cost allocation. It's because if you go back, and this is another problem with FERC, really, if you go back to something like Order 1000, that kind of sets the whole stage right, FERC has said that if you have regional benefits, then you not only have to have regional cost allocation, you have to have regional planning. You have to have competition. You have to go through that process that has been set up for the projects that have regional cost allocation. So, you know, there's a reason that the owners want to say, we're just going to put these in the local bucket, because the moment you acknowledge that we're talking about a category that has projects that have tens, hundreds of millions, I mean, you know, over time, we could be talking about billions of dollars, costs that are being under cost causation principles misallocated, that not only says we need to allocate the cost differently, it really goes to show why this whole regime that the local proposal has put in place just doesn't work, because we should be doing regional planning, not just regional cost allocation, in instances where we have needs that arise that impact each other. Any further questions? Thank you. We'll give you some time on the webinar. David Gossett for the Transmission Owner Petitioners. The legal determination that the owner's agreement is ambiguous has no basis in the controlling document. Mr. Gossett, could you start withstanding? Of course, Your Honor. Can you, you, you repeated,  ambiguous. In this case, and what you're challenging here is their, is their reasoning, correct? Can you cite any case which suggests you have standing under these circumstances? Your Honor, the commission made two separate legal determinations. It made the legal determination that the owner's agreement was ambiguous. And then they separate, they made the legal determination that the transmission owners would plan for these specific end-of-life projects. That first legal determination is a separate one that has separate consequences. So I go back to my question. Can you cite a case where, let me just finish my question, where a petitioner had succeeded on the merits, but is challenging the reasoning? I mean, in Sealand, the court talked about how, if there was a separate proceeding as a result of the reasoning, it would be sufficient. And the metric constructors case that we discussed in our reply were similar. But I mean, I think it's important here to focus on what the consequences of that legal determination are and the fact that the commission never really engaged with that. We submitted a factual declaration in the record that the finding of the agreement was costing the transmission owners time and money in separate proceedings, in proceedings addressing other forms of. I read all that. My question is whether that's enough for article three standard. Not all injuries are sufficient to support article three statement. Some are too amorphous or too contextual. Of course your honor. But I think we have specified concrete injuries that are not therefore amorphous or conjectural. It is costing the transmission owners time and money in the planning of other forms of supplemental projects, other forms of asset management projects that are not end of life projects, but that are today. We are being challenged by the stakeholders and others saying these are under the commission's ruling project that should be planned, must be planned by PJM rather than by the transmission owners. And that's costing us money in the real world today. It's a very concrete injury that we believe is sufficient under legal uncertainty is an injury because it creates legal fees. I mean, no, your honor, because it's not, I mean, the finding of ambiguity is not an uncertainty. It's not uncertain. There has been a finding here that the owner's agreement is ambiguous. So it's this weird circumstance where the actual legal finding is, you know, is, is a finding of uncertainty. That's the legal findings here. So it's not, we're not saying that there is uncertainty about legal violence. There is certainty that the commission has said that the owner's agreement is unambiguous. There's a certainty about uncertainty. Yes. That creates an article three injuring fact. I don't know if there are any cases that suggest that that's true to judge sales. I have not found any cases in which the, the injury specifically is a finding of ambiguity, but here we believe that that injury is precise and has a directly traceable consequences to our members. I mean, as Mr. If that is reversed, what does it accomplish? Well, you know, if that particular finding or reversing on that particular order point, what does that accomplish? What do you need us to do in that regard? And, you know, what's the consequence of that? Well, the consequence as to this litigation, I would suggest would be that the commission of the court would grant petitions for review and make it for a remand. They have remanded that they fear for purposes of the commission to clarify, to re rework its orders along the lines that had done three times already. It's consequences in other circumstances would be that it would, it would have to be reversed. I guess I'm asking, are you asking just to delete that particular finding about the uncertainty? I mean, she's in the ambiguity. Yes, that is what we as petitioners are asking for is that the, the court hold that the commission erred in finding the owners agreement to be ambiguous. And as a result of that, essentially remand for the purposes of the commission Tuesday, the owners and the agreement unambiguously gives us the rights to plan the specified end of life project. It's important to note that the commission said that the owners agreement was ambiguous, but never actually really relied on that fact. I mean, they said that they were going to look at extrinsic evidence, but then in fact, the evidence they looked to was exactly the kinds of evidence that you would normally look to under Shepard step one, or in a contract interpretation case to decide what the contract means, to decide whether the contract is unambiguous in the first place. So they look to history and pattern of practice in the industry. That's exactly the material that the commission itself in paragraph 14 of the hearing order said, you'll look to look to decide as a human. So it really is a reach here. It's an agglomeration of power on the part of the commission. Because what does the finding of ambiguity do? It transfers the decision-making about what the owner's agreement does. It says to the commission, I mean, it's exactly what the commission did in Atlantic city. That's always the case in a situation where an agency or a court includes which is ambiguous. I mean, that's nothing new. That happens. That's the, that's inherent in the judgment. It's something to be. Yes, your honor. So I'm not sure why that's relevant to your standing. I was addressing judge trial on the merits. Your honor. I thought her question was a marriage question. That's okay. Keep going. I'm sorry. If that's what you were doing, I apologize for interrupting you on that. Perhaps seeking remand without vacater as a giveaway that there's no real injury. I do think there is injury in the context we've said, though, of course, I do also think that the commission is a court in reviewing the commission's order here could review this legal reasoning, regardless of our standing to bring this case. I mean, it's a legal question for the court to. Yeah. I don't want to take this. If we don't, if you don't have standing, why would we review that in this part of the case? If we don't have standing, your honor, we think you could review it in the other part. I guess. Yes. That I agree with you on that. That was my point. It doesn't have any consequences for what this court has to do. Correct. The court has to decide whether the commission error in its interpretation. Okay. That's all. Thank you. Morning. Good morning. Susanna Q for the commission. Do you have any views about this standing question? I'm sorry. Do you have any views about this standing issue? I, well, I, I think, exactly the question that the commission has been asking the commission rules in favor of the transmission owners. We don't think that any, it's that uncertainty, even if it's certain uncertainty is an actual arm position for article three standing. I think that there, you know, we received all the substantive relief that they wanted. Do you agree? Even if we agree with you about that, but we still have to address that issue in the stakeholders part of the case. Right. Right. Right. Even if the transition on the petitioners have no standing, of course, there's the stakeholder petitioners, which that has to be reviewed. Okay. And just to clean up some discussions from previous parts of the commission, I'm going to turn it over to Susanna to talk a little bit more about the  And then I'm going to turn it over to the commission to talk a little bit more about the section 9.2. Your honor, the commission, as we explained in our brief, we think that the transmission owners certainly retained their section two or five filing rights with respect to the tariff. Look at the section in its entirety. You know, you'll see other indications that the transition owners did not confine themselves to only filing rate and transition revenue requirement changes. For example, at the end of section 9.2, ask the transition owners preserve their right, their right to assert that other provisions of the tariff should be included within their section 205 rights. And that's a J.A. 2265. We may think applying Atlantic City, you know, there's this commission did not feel that it could hold that the transition owners last section 205 filing rights here. Is there any reason that these proposals weren't considered in a consolidated way? I think Judge Rao made a point about the practicality of reviewing these two proposals. I do want to emphasize that how these pieces were teed up at FERC had no impact on the ultimate resolution. The commission objectively considered each of these proposals on their own merits. There are each section 205 filings. They have to be considered under the burden of the, you know, the proponent of the proposal had to show that it was just unreasonable. And the commission accepted the transition owner proposal as just and reasonable because it was consistent with the lines that were drawn in the PJM governing document. It did not alter any actual division of authority. On the other hand, the stakeholder proposal was not accepted as contrary to the lines that were drawn in the PJM governing agreement. And here, I'd like to point out that the commission, separating these out, I think it makes it easier for FERC to kind of put aside the cost allocation issue. It says, well, the transition owner proposal is not to a specific allocation of costs. And so we're not going to consider that here. And then, you know, taking the proposal separately, you know, FERC seems to have avoided its responsibility to think about how these costs are allocated.  I think it's important to underline principles for the 1,000 and 2,000 and, you know, the sort of the whole idea of regional transmission. Right. So your Honor, you're correct. Absolutely. Cost allocation is hugely important in regional transmission planning. But this case, let me emphasize first, that this case isn't about transmission planning policy. And the commission is actively engaged on issues relating to cost allocation outside of this case. For example, in the concurring statement by Commissioner Clement, she discusses the ongoing proposed rulemaking on transmission policy issues for the commission. That's discussed at joint appendix 26. I mean, so what about the cost allocations here? I mean, so, so FERC's position here is strange to me, very peculiar, because FERC's ultimate conclusion is that the, the agreement is ambiguous. And so therefore it doesn't actually settle who should resolve, you know, who should plan end of life projects. So if that's the case, then making a decision that transmission owners plan end of life projects will of course have consequences for costs because you're, you know, FERC concluded that it was ambiguous. So that by sort of by definition, if it's ambiguous, it doesn't then settle the cost allocation. So by choosing the transmission owner proposal, you are choosing one particular allocation cost. And then why isn't it incumbent on FERC to determine whether that cost allocation is just and reasonable? For your honor, it's important to remember this. This was not a section 206 complaint. So that's what makes this case different from the old Dominion case. You know, that case involved an identified set of transmission projects. So we knew what they were. And that set of transmission projects, the transmission owners actually made a filing to remove them from regional cost allocation. These are projects that were originally identified as form 715 projects, which are planned by PJM and typically would have been subject to broad regional cost allocation. But in that case, the transmission owners chose to make a tariff filing to remove them from regional cost allocation. Now this case doesn't involve anything like that. Why not? Why not on FERC's first conclusion that it's ambiguous. So it is making a change to the allocation. So your honor, there's no change to the allocation. The ambiguity finding relates to the specific language in the owner's agreement, the expansion and enhancement language. Of course, you know, the commission had before it two parties that were advancing very different proposals and saying that the owner's agreement was unambiguous in two opposite directions. So the commission turned to the language of that owner's agreement and specifically section 6.3.4 at JA 2367, which says that PJM shall conduct its planning for the expansion and enhancement. And so it's based on a horizon of at least 10 years. I just don't feel like you're answering my question. My question is if the commission believes that that was ambiguous and then they pick the transmission owner proposal in the context of what they say is an ambiguous agreement, then doesn't that have consequences for costs? Namely that these projects are going to have costs assigned locally. Okay. I apologize. You're right that there are consequences for costs. Yeah. And if that's true, then why does FERC not have to determine whether that allocation is just unreasonable on a cost causation type of principle? Right. And that's because there are, there are consequences for the cost practically speaking in, you know, in like on the ground. However, these are two proposals that are made under section 205 and neither proposal actually made any change to the existing cost allocation methods that are set out in the PJM tariff. Well, I mean the fact that it doesn't change one particular part of the tariff doesn't mean that as you say, it does have consequences for costs. So, so just because it doesn't modify one particular part of the tariff, you're saying FERC is absolved of considering cost causation, you know, against the background where FERC is supposed to be trying to promote efficient cost-effective regional planning of transmission upgrades for the benefit of the public. So, so why does FERC not believe it has to consider that in this context? Well, the commission felt it was not appropriate in the context of these federal power act section 205 filings. And it felt that it, the larger competitive considerations that inform the commission's policy concerns, those are addressed in other contexts, right? They could be addressed as they are being addressed in the generic rulemaking about transmission planning and cost allocation. They could also be addressed in the section 206 complaint filing, which would be under 16 USC section 824E. And there, that would be a challenge to the existing cost allocation as not just unreasonable. So here we don't have that. This is not a section 206 proceeding where parties or any party is challenging the existing cost allocation as unjust and unreasonable. FERC approved a cost allocation, I think by approving a transmission on a proposal. Is that incorrect? I mean, in a section 205 filing, FERC still has to determine that what it's accepting is just unreasonable. It's correct. The commission accepted it as just unreasonable, but on the basis that it didn't change the status quo, the existing cost allocation remained the same. But that's, that's my question, right? Because actually on FERC's view, it did change the status quo because FERC believes that the agreement was ambiguous. So, so if FERC holds to the idea that it's ambiguous, then by accepting the 205 filing, it is making a change. It is not the status quo on FERC's own reasoning. So at least at a minimum, FERC's internal reasoning is unreasonable, maybe or arbitrary and capricious. Like, I don't know how FERC's reasoning kind of all lines up to reach the conclusion that it did. I think the commission, you know, what's happened is that the commission is looking not just at this one permission, but it's looking at the operating agreement. It's considering PJM's position that PJM does not have this authority and cannot do this planning. And it's looking at the operating agreement, which specifies that it's important to remember that PJM doesn't have, doesn't necessarily plan all regional projects. I mean, there is substantial overlap to some degree here. I mean, there are projects that, you know, that may address a local need and also a regional need. And under the existing tariff, what happens is PJM does get this information from the transmission owners and PJM has the opportunity to plan a regional project, you know, with the information about this local planning project. So there is significant complexity here, but the commission ultimately found that the governing documents do specify, you know, they do specify that transmission owners retain certain planning authorities. They retained planning authorities for supplemental projects. And that's basically all of the projects that are not included in the PJM regional transmission expansion plan. So what the commission was accepting was a proposal that just formalized the process for the planning of these projects. Previously, they would have been planned as supplemental projects, or if they had been identified on a utility form 715, they would have been planned by PJM, such as the projects that were at issue in Old Dominion. I'm sorry, that doesn't answer your question. I can try again. All right. I do just want to clarify that the, the orders don't cement anything in place. You know, they don't cement anything in place. I mean, this is the current state of play in PJM. However, to the extent that parties have concerns about a specific cost allocation, they can always bring these concerns to the commission as a section 206 complaint. And of course these issues are being considered in the rulemaking proceedings. So isn't that what the previous orders, like order 1000, order 2000 was designed to prevent, right. By creating kind of an overall system of regional planning to sort of avoid this, like case by case determination about whether a particular cost allocation was unjust. I mean, that was sort of, I mean, that could have happened even before, but you're right. That is the motivating, what is motivating concerns of order 1000. I mean,   there's a lot of work that needs to be done. But PJM does do regional planning through the regional transmission expansion plan. And it's now taken out of PJM's authority, all end of life projects, which are a substantial part of what's going to be, I mean, especially in, in, you know, in the Northeast where expansion of the grid is extremely difficult because of regulatory and other hurdles. I mean, the whole ballpark is enhancement and upgrading of systems. And FERC has said that all of that is now left to local transmission owners. Great. So how is that consistent with orders 1000 and 2000? Well, the orders 1000 and 2000 did recognize that not all planning was regional that, you know, there are, there are projects that continue to be local in nature. And that's where the commission found here that over placement of equipment continues to be local in nature. It falls within, it falls on that side of the line. I mean, I understand your other concerns that, you know, yes, this is a significant number of projects, but it, you know, it is important to remember that the PJM does some of these end of life projects. And those are the so-called form seven 15 projects. Yeah. I want to take you back to my 9.2 question. Yes. I'm just looking at the language of, of this. I don't see why it isn't a surrender of their, of their filing rights here. It says, it says a PJM shall have the exclusive and unilateral right to file. Let's see, make changes in or relating to the terms and conditions of the PJM. Yeah. With the exception, with one exception, why is that not a complete surrender of your two or five? I just, I don't understand. My understanding of PJM as a practical matter. No, tell me the language. I'm sorry. You're looking at 9.2. 9.2. Yeah. Look at the language. I don't mean to be a textualist here, but that's what we are. 9.2. You got it. Yes. Okay. PJM says shall have the exclusive and unilateral right to make changes in or relating to the terms and conditions of the PJM tariff. That sounds like what this is all about. Right. You're on it. As a practical matter, PJM is filing for the transition owners to her. You know, it's, you know, that my understanding, and I think that council for transmission owners would be better able to discuss the, I thought they didn't go through the PJM procedures to make a filing. Right. Didn't they file it directly? The cover letter and all of that is prepared by the transmission owners. Actual filing. My understanding, the actual filing was done by PJM. Oh, do you have something in the record that says that? What was your point to that? That I don't know if I could put anything in the record that might be a function of the, I mean, the transmission owners, sorry, they're arguing that it was not done that way. It didn't go through PJM. At least as I understand it. Right. They just filed. Right. So they, and the stakeholders filed separately. Right. Exactly. That's correct. But my understanding is that PJM actually made the filing. So, but yeah, and I think you're on it. It's the overlay of Atlantic city and the, you know, the, also the provision, for example, the owner's agreement that says that, you know, rights not specifically transferred to PJM remain with the, with the transmission owners. Yeah, but this, okay. I hear you. This is exclusive and unilateral right to file. But all that leads to them is what's in the end of the sentence. So I will, we can pursue this. Okay. That's interesting that your point, I haven't understood that this was actually submitted by PJM through their features. That would certainly solve the problem. If that's the case. Yeah. Okay. Thank you. Thank you. Thank you. Transmission owners. We can kind of let down a path there and I think we're down the wrong path. And I'd like to kind of get us on the best way. Who's the way us? I think that happens in certain cases. First of all, we get to go down any path. First of all, the side of this issue. Okay. First, the first held that the agreement was ambiguous, but first decided this issue first decided that. Transmission owners have the authority to plan end of life projects. Period. They decided it's done. There's no ambiguity about that decision. It is based on the finding that we disagree with that the agreement was ambiguous. But looking at that agreement first, Absolutely. Deciding that end of life projects are planned by the transition owners. There's no doubt about that. That's why we're depending on the agreement or as an amendment to M3. They decided it. They decided it. So amendments to M3 were proposed by the transmission owners. Kirk decided that those amendments should be accepted. And this has nothing to do with, you know, separating out the issue. We can get to that later. Kirk decided those amendments should be accepted because end of life projects had always been planned by the local TOS. PJM has never planned these end of life projects, at least as they're defined here, where they don't expand and enhance the grid. And when they don't address some other regional planning need of PJM. So there's no change in that issue. So this discussion we've had that projects have been dedicated to local planning. There's something to change. There has been no change. PJM has never planned these projects and that's never gotten in the way of regional planning. So there's no change on that. We've always planned these projects. What does it mean for there to be no change if both parties disagree about what was required by the tariff and the agreement and they both propose amendments? Well, first of all. One to M3 and one to the agreement. First of all, the parties to the owner's agreement, which is the fundamental basis of all this, because the owner's agreement decides based on Atlantic City what powers the transmission operators have and what powers PJM has. The parties to the owner's agreement are PJM and the transmission owners. Those parties don't disagree. The parties to the owner's agreement fully agree that these end of life projects have always been planned by the transmission owners, will still be planned by the transmission owners, and that's not going to affect PJM's regional planning. So the parties are in agreement on that. The parties that are not in agreement are strangers to the owner's agreement, LSP, and I guess they have some small part of their group. But basically, the primary driver of all of this is somebody who's not an incumbent transmission owner, who's trying to come in and get authority to plan the projects that have been reserved to us. Now, we had a long discussion about cost allocation and all of that. I think this is what you have to understand about that. The regional cost allocation in Old Dominion and all these cases, there's regional cost allocation when there's regional planning. Okay, here there's no regional planning. There has never been regional planning of these projects. It's always been local planning. So when the petitioner, Ms. Murphy, talks about, you know, Old Dominion and cost allocation, she's putting the cart before the horse because in those cases, there was regional planning. Because there was regional planning, there was presumed to be regional benefits, and because there were presumed to be regional benefits, we have this 50-50 system where in the regional planning side, half of it goes to the whole PJM, you know, all of the loans, and half of it goes to the people actually getting the flow. Okay, in this particular case, there's no presumption of regional benefits in the regional planning because there has never been regional planning of these projects. They are local projects. They do not expand and enhance the grid. They're not plans to expand and enhance the grid. So we're just on the completely wrong track here where we're putting the cart before the horse here saying, well, FERC had to consider regional cost allocation. Why is an end-of-life project not an enhancement? Because it's not planned to enhance the grid. It is planned to replace the project. There may be, and Murphy explained this very well in the California Waters. Those got a feel. I think OSB appeals to those that got settled. So just focus on the word enhance. Right. And why is, you know, replacing, you know, firming up a transmission line not an enhancement? Because the question is not, does it have some enhancing effect? The question was, is it planned to enhance or expect to? But we're talking about planning here. And this is an allocation of planning responsibility. So the plan is to replace the project. It's not to upgrade it or enhance it. Now, you may have an incidental enhancement. In fact, the question is, what's the planning? And I need to go back to this to talk about this allocation because it's very central to all of this. What's left to the transmission owner planning? What's left to the PJM planning? There are specific planning authorities, regional planning authorities that were given to PJM by the transmission owners. Because they have to remember, this is what Atlantic City was about. We had millions, millions of dollars in assets. We were being asked to give control of those assets over to another entity. Okay. People don't do that just willy-nilly. We think it would be a good idea if they had this all. This is our property. We have the right to control this property. And all of a sudden, people are coming in and saying, but we think it would be nice for regional planning purposes if you gave us control of our property. Well, we thought of that. We litigated it at Atlantic City. We got a strong decision from this court that they can't force us to give up anything we haven't given up. Now what we're saying is, well, because of this language of 9.2, we somehow gave up our right to all of this planning. We sent out very, very specifically in the owner's agreement. All they get is the power to plan for expansion and expansion. If that's correct, though, why isn't it within PJM's authority to determine what should be part of the regional plan as an enhancement or extension? It is, and this is another very important point that's been missed. When the transmission owners propose an end-of-life project, they have to notify now. We agree to that. We notify PJM. Here's what's coming down for the next five years. Here are the end-of-life projects that are coming down the pipe. Okay. PJM can look at that and can say, look, you say this is just a replacement, but we're looking at it. We've got our regional planning, and we have specific planning authorities that you've given us, Atlantic City. Under Atlantic City, we said this is what we gave them. The right to plan for reliability, the right to plan 715 projects, the right to plan economically. So PJM can say, look, we have this authority for regional planning for all the good reasons we talked about with Order 1000, Order 2000, all that. We have this authority. And so what we're saying is you're proposing an end-of-life project, but we think actually it overlaps with our planning responsibility. We've identified some reliability concerns in this area. So what we're going to say is we're not going to just let you build that project. We have exercised our planning authority, fully recognized under Attachment M3, Part 5, the applicability section, JA2301. When there's an overlap between the local project and the regional project, PJM gets to plan that project, and it gets to assign the project and Ms. Murphy's clients can build that project. That's for an overlap. We can't stop that. Transmission owners can't stop it. So that protects this regional planning concern. Now, if that plan, if PJM decides that, yes, this plan has, this project has a regional benefit, then the cost allocation rules that Ms. Murphy is talking about come into play. You've got regional planning. Now PJM has, within its authority, taken this regional planning. Now you've got a regional project. Now you presume the regional benefits. So now this 50-50 system that you'd like to apply to these local projects makes sense because it's regional. When PJM doesn't do that, when PJM says, no, there's no overlap here, it's solely a local project, then it stays a local project, and it stays with a local zone, and that's always been the rule. It's not changed by it. Are you saying that PJM can override a transmission owner's decision to locally plan a project in every instance? No, in every instance within PJM's delegated authority. So when PJM says, we have the authority to plan for a liability. My question is, can PJM assert that we believe this is an enhancement and then make it part of the regional plan? They can. They can assert that. Now, you know, obviously it has to be within their authority, but we assume that PJM asserts it. And that's why PJM is on board with this. This is affecting PJM's regional planning. Who decides whether it's within PJM's authority at that point? That's an interesting question. So here's the way it actually comes out. I mean, wouldn't it be ultimately cert? Let's put it this way. If we got into a disagreement with PJM and we said that PJM was asserting authority outside the owner's agreement, which is our contractual, you know, protection for our property that we gave, ultimately I suppose we wind up in this court. But basically we really haven't had those disputes. And we certainly didn't have this dispute here. PJM fully agrees this is not affecting them, that they understand they only got some authority, they didn't get this authority, and this doesn't come in. But the answer to your question is, yes, if PJM asserts that and wants to put it in the plan, we cannot stop them from putting it into the plan. I mean, I suppose we could try to argue it doesn't really create reliability, but we would never do that. It would never come up. If PJM wants to build the project, PJM can direct building the project. We can't do anything. Why does PJM care then in this context? PJM cares because PJM knows the whole history of this. We've had a whole system set up for now 20 years where everybody understands, you know, what's regional and what's local. We've all been working under this system for 20 years, and it's protected our property rights. Now we have a third party to all of this, LSP, with some space bumps and some, you know, transmission owners I guess they got on their side. Now we've got them coming in and trying to upset the whole apple cart. Now I understand why they're trying to do that. They want to get their hands on these projects. But these have been projects that were reserved to us under Atlantic City. By the way, this isn't the first time LSP has done this. This is the third time they've been here this year trying to get their hands on this stuff. They're not entitled to it under our agreement. They're just not. PJM agrees. PJM knows the deal. When the stakeholders came to this proposal and said, hey, wouldn't it be nice if we could have some competitors come in and get their mitts on the transmission owner's property, you know, LSP says that's fine, but the regulators say, fine, they're always after us. Sure, why not? Let's throw it up a little bit. But that's our property. That's what Atlantic City was all about. Isn't the whole concern, though, is that, yes, it's your property, but if there's no competition and no regional planning, then consumers are at the short end of the stick when there's no competitive bidding for improvements to the transmission grid? That's the argument they made, and actually that's why, you know, yes, it all sounds good in the abstract, but that's one of the reasons we made our standing argument is when you really look at what's going on here, that's not what's happening. First of all, it's often nice if somebody has property and lets somebody else compete for their property. Yeah, that might be competition. The point is we reserve this right. It's our property. But the second point is the idea that we can engage in all kinds of inefficient planning or inefficient process, it's just not true. First of all, if there is efficiency in regional planning, DGM can say, yes, we've identified that this is in our planning process and we're going to build that project. If DGM says no and we build the project in our local zone, we can't recover costs for that unless we go to FERC, get it put in our transmission rate base. They have the right to discovery in that process. They can look at everything in connection with that project and say, you know, it should have been better. There's also prudency reviews. So the notion that somehow because LSP isn't allowed to come onto our rights of way and take over the projects that we reserved ourselves under the agreement, there's going to be a huge downside to consumers. It's just not going to be. First of all, they can't come onto our rights of way anyway. That was part of our standing argument. And they say in response to that, well, maybe state law lets us do it. Maybe it doesn't. It sounds kind of speculative to me. I don't know. But the real question is, we reserve in Atlantic City, confirmed by this report, a very strong opinion. And really, just to back up again, the whole point of Atlantic City was FERC said, just kind of what the audience is hearing now, regional planning is good. Wouldn't it be nice if we gave PJM all of this regional planning authority? And the transmission owners came and said, well, you know, that's our property. We reserved rights to that. You can't. You, FERC. I mean, FERC was on their side back then. And this report said, you cannot do that. You cannot, just because you think it would be nice for regional planning purposes, take the transmission owners' property and give it over to PJM when they haven't agreed to that. The transmission owners, it's a voluntary RTO. We have to voluntarily give up our authority. We did not give up our authority. And we did not give up our authority on the Blank Project. So put another way, from your point of view, there's nothing ambiguous about this, correct? There's nothing what? Ambiguous. Well, we don't think there's anything ambiguous about this. FERC did think there was some ambiguity as to whether we gave up these rights or didn't. We strongly disagree with the reasons Mr. Gossett said. The bottom line is FERC ultimately decided we didn't give them up. They decided that issue. There's no ambiguity about FERC's holding. They decided we didn't give up those rights. Okay. All right. That is all very, very helpful to me. Could you be equally helpful on the language of tariff 9.2 for me? Yes. Could you please just look at the language. I understand. And tell me, you've heard me ask this question at least three times. I have. Okay. So what, from your perspective, is the answer to my question? Okay. First of all, 9.2 gives rights to PJM. It doesn't give rights to stakeholders. I understand that. I get it. As a matter of fact, it expressly distinguishes PJM from the Members Committee. I get it. Okay. Yep. They can consult. So it doesn't mean PJM can consult with the TOs and the Members Committee. I just want you to focus on the language that says, which states that PJM has unilateral control over filings regarding the terms and conditions of the PAC tariff. That's the language I want you to focus on. Well, EXCEPT is described in 9.1a. And, of course, 9.1a has very broad authority for us to reserve our rights under. And what precisely in 9.1a reserves the rights over EOL? Transmission revenue requirements of transmission rate resigned under the PJM tariff. Any provision governing the recovery of transmission-related costs by the transmission owners. So, for example, by the stakeholders' own assertion, they're saying if we succeed in obtaining local planning authority for this in our proposal, that will all be locally charged, will all go into our rate base. So it definitely affects our rates under 9.1a. But look also, as Ms. Chu pointed out, look to 9.1f, where it says the transmission owners reserve their rights to assert that other provisions of the oath should be included within their Section 205 rights and PJM reserves its right to contest such assertions. That's very important because that goes to the issue and that goes to 5.6 of the owner's agreement. Having been through all of this discussion and litigation in Atlantic City to fight piggyback on Kirk's attempt to get at our transmission assets, we made very clear in the owner's agreement that PJM only has this authority for expansion and enhancement and the other specific authorities given reliability, 715 and all that. And most importantly, anything we didn't expressly delegate in the owner's agreement to PJM, we retained those views. So would I be wrong if I said, I'm trying to restate your position here in a way I might understand. The point is, you did not surrender. The transmission owners never surrendered their authority over EOL projects. That is correct. Let me just finish. Over EOL projects. And it would have made no sense for them to surrender their 205 filing rights over those projects. Correct. Is that the point? Correct. Do I have it? Correct. And that's what Kirk held. The issue is what tariff rights we gave up. We didn't give up these tariff body rights. Therefore, under Atlantic City, we get rid of them. And was transmission owners filing in this case through PJM or directly to the commission? I think our first filing, I think we made it directly. That's signed by my partner. But they do have authority. This is another thing about how the filing system works. So we can delegate to PJM our authority to make filings. And that's mostly just for the tariff. It's a long tariff. It's very complicated. That's mostly just to make sure it all works together. I'm sorry. No, I'm sorry. I'm wrong about that. It was on our firm's letterhead. But it does say it in the note. Pursuant to Order 714, this filing is submitted by PJM on behalf of the PJM transmission owners as part of an XML filing package that conforms to the commission's regulations. And the reason for that is because it's a long tariff. And we want to make sure everything fits together right. And so that PJM dots the i's and crosses the t's as they're doing it on our behalf. But see, that's where 9.2 comes in. So this whole argument that transmission owners surrendered their rights is just a red herring because PJM submitted it anyway, right? I think, first of all, that's correct. Second, it's an absolute red herring to say the State Board can control the filing under 9.2. It's absolutely clear in 9.2b they can't. As a matter of fact, they can't veto or even delay the file.  I just read the argument as saying not that they could control it. They were looking for a ruling from this court that only PJM could make the file. Your point is PJM did make the file. PJM did make the file. So who cares, right? Yeah, that's right. PJM did make the file, so who cares. But then the second issue is the whole issue is this allocation of authority between PJM and the transmission owners. So if we had made this filing and PJM had said no, that's within our planning authority, that's within, we need this for, you know, regional planning authority to be reliable and all that, PJM would have said no, you know, just like they did with the stakeholders. They would have disagreed with us. And as a matter of fact, there's actually a provision of their disputes regarding the filing rights. We go ahead and do this. But none of that is really an issue here because PJM agreed with us. PJM had been through the Atlantic City case. They lost, right? We won it. Okay. They didn't want to have that fight again. They know what the rules are. We know what the rules are. Okay. Mr. Blanchard, let me see if my colleagues have any further questions. No. Judge Cato? The only other point I want to make is they argued that somehow this whole issue on the filing, but we stole a march on them somehow because we filed ahead of them. They didn't come in second because we stole a march on them. They proposed their thing and they lost. They had a failed vote. So the idea that somehow we created this system that created a bad situation for them and how this was all set up and that FERC wouldn't decide. FERC didn't consolidate the cases. Our filing was about our rights. It makes perfect sense for FERC to decide our filing based on our rights. But the idea that somehow they were disadvantaged, they were last because they lost the vote, not because of anything. Okay. Mr. Gossett, I believe you're going to do the first rebuttal. I'll give you two minutes. Unless the court has any questions for me, I'll actually wait for a rebuttal. I think that the issues of standing ambiguity have been addressed and nothing new came up unless the court has any. Can I just ask you one more question? You say, I'm looking at page 25 of your brief. I'm still focused on 9.2 here. You say that the phrase means only, quote, the terms and conditions of interconnection, point-to-point transmission services, and network transmission services under the tab. That's what you said. I'm sorry. Are you trying to ask Mr. Longstock? Yes. I'm sorry. Oh, I'm sorry. I just, yeah. Is that okay? Yes. Could you just answer that question about the sentence in your brief? Do you see where I am? I'm at page, I'm at page, I'm at page, yeah, here, page 25. You say what this means. I mean, this phrase, this 9.2 language means only, quote, the terms and conditions of interconnection, point-to-point transmission services, and network transmission services under the tab. Right. Do you have a site for that? I'm not sure that I do. That is the understanding that we've had and the feelings that we've had. I mean, that's consistent with what you were saying all along. I just wonder what you would say. Yeah. That's all. Yeah. And I'll look at it and see if we have it. I think we put that in because that was the understanding people have been working with for a long time. But the point is, thank you. If you have a site for it, I will understand. Sorry. Thank you. Yes, I'm looking for Ms. Murphy. Thank you. I'll give you two minutes. Thank you. I just want to make a couple of points. First, while the interviewers love to talk about LSP and their fear of competition, I want to be clear. I'm standing up here on behalf of about a dozen different parties, including the People's Council for D.C., the New Jersey Rape Council, the Public Advocate for Delaware. These are organizations that are designed to be here on behalf of rape payers who are very concerned about the out-of-control costs that they are facing because there's no accountability for these projects. So, sure, competition is part of this, and I have clients who want to compete, but that is by no means the only reason that I am up here today for the only parties that we are up here on behalf of. I want to also clear up some confusion, I think, that was generated about what PJM can do under the local proposal. Yes, if PJM is planning something else that it determines, and it obviates the need for an end-of-life project, it can say, you don't get to do the end-of-life project because pursuant to some other planning we've already done, that project isn't necessary. But what it can't do is actually review these end-of-life needs on a case-by-case basis and say, hey, is replacement makes sense here? Is that what's in the best interest of the grid? Should we maybe be thinking about a line somewhere else as what would enhance and expand the grid in the best manner? Maybe not to replace this facility at all because we don't need lines bringing power from coal mines in West Virginia anymore. We need them bringing from wind farms on the coast of Virginia. So, Ms. Murphy, you disagree with Mr. Longstrip's characterization that PJM can override a decision on an end-of-life project? I think he was being very, very careful about his wording. There are circumstances in which PJM can override, but they are very narrow. They are circumstances where PJM pursuant to other planning authority is basically, you know, pursuant to... So not pursuant to its general... Not, it can't, there's nothing in the local proposal that allows, that says, hey, we're going to ask PJM if they think we should do this end-of-life project. And if they say no, hands off. You know, it's just that if there's overlap between some other project that PJM is planning pursuant to some other authority, there's nothing to do with the need that the project is arising by virtue of the retirement. PJM can say, hey, we've already got this, so in this instance, you know, you don't get to do the project or we need that project to be part of this project. What we wanted was exactly what, you know, what I think would be... It sounded a little bit like they were saying is what exists and it's not, which is something where PJM gets to look at these projects and say, should they happen at all? Should they be regionally competitive? Should they be locally planned? The last thing I just want to talk about just a little bit is the cost causation and Old Dominion and Section 205 versus Section 206. I mean, for one thing, Old Dominion was not a Section 206 case. It was a Section 205 case that was almost exactly like this one. What had happened was there was a 205 proposal to take a category of end-of-life projects and say that category of end-of-life projects should be categorically set for local cost allocation. And it happened. You know, part of the reason there was objections to that was the particular project at hand, the Old Dominion project, demonstrated that there were projects within that category that had regional benefits. And what this court said was the cost causation principle focuses on project benefits, not on how the particular planning criteria were developed. So, you know, the notion that it kind of started local or started... It doesn't really matter. What matters is FERC needs to confront the problem that you have projects here that have regional benefits. And I don't think... I mean, FERC didn't even rely on the idea below that you can fix all of this through a 206 filing, but I think there's a reason for that. It's because the 205 filing says, this is the filed rate. We've decided that this is right. A 206 filing, it doesn't allow us to come in and change the planning, and it only allows us to come in and say, you've got the filed rate rate wrong, which, of course, is arguing with one hand tied behind the back, because we're fighting against what has already been deemed to be adjusted. And do you think that type of case-by-case 206 filings would be inconsistent with the framework of regional planning and the other FERC orders? I don't think it... I think it doesn't solve the planning problem, because it's really just about cost allocation. And here, you know, it might help address the problem, the inconsistency with this court's precedent, because this court's precedent requires cost allocation without regard to planning, but FERC's precedent actually says, hey, if regional cost allocation is required, then so too is regional planning. And I don't understand the Section 206 filings to allow reopening of that question about who should have planned this, how should this have been done in the first instance. All it is is, I mean, don't get me wrong, like, we'd love to get some money back if there's going to be projects that end up producing unjust and unreasonable rates, but that doesn't solve the more fundamental problem. I mean, it's kind of striking for me that FERC says this case isn't about transmission filing policy. That's all about... That's first and foremost what this case is about, is who's going to be doing the transmission planning. We think that if you're talking about a category of projects that involves things that are going to have regional impact, that the regional planning authority should be involved. Any further questions? Thank you, Ms. Murphy. And I say thank you to all counsel for their arguments. The case is submitted.
judges: Rao, Childs, Tatel